Timothy J. Preso
Jenny K. Harbine
Earthjustice
313 East Main Street
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
jharbine@earthjustice.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN; MONTANA ENVIRONMENTAL INFORMATION CENTER; and NATURAL RESOURCES DEFENSE COUNCIL; ) ) ) ) ) ) | Case No. |
| Plaintiffs, ) | |
| v. ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| KEN SALAZAR, Secretary, U.S. Department of the Interior, in his official capacity; and UNITED STATES FISH AND WILDLIFE SERVICE ) ) ) ) ) | |
| Defendants. ) | |

## INTRODUCTION

1.      This case challenges the approval by the United States Fish and Wildlife Service ("FWS") of logging and road building activities to be carried out by the Montana Department of Natural Resources and Conservation (the "Department") on state trust lands containing sensitive habitat for imperiled wildlife in western Montana.

2.      The wild lands of western Montana contain some of the last prime habitat in the United States for threatened grizzly bears and bull trout.  Western Montana still has large stretches of mountain-and-meadow land, making it one of the last remaining strongholds in the lower forty-eight states for grizzly bears, which once ranged south into Mexico and west to the Pacific, but today have been cornered into the northern Rockies and surrounding lands.  And western Montana still has cold, clean streams for bull trout, a species whose historic range has shrunk by half.

3.      Both the grizzly bear and the bull trout are shielded from harmful activities by the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.  A central purpose of the ESA is to guard species from extinction by protecting their habitat—"by provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  Id. § 1531(b).  Yet

FWS has approved a plan that allows extensive logging and road building on state trust lands throughout the region.  FWS acknowledged that these activities will "take" grizzly bears and bull trout through the disturbance of secure grizzly habitat, release of sediment into streams, and other impacts.  Id. § 1538(a)(1); Montana Field Office, Fish and Wildlife Service, <u>Biological/Conference Opinion for the Proposed Issuance of a Section 10(a)(1)(B) Incidental Take Permit to the Montana Department of Natural Resources and Conservation for their Forested Trust Lands Habitat Conservation Plan</u> II-124-38; IV-293-99 (2011) ("BiOp" or "Biological Opinion").

4.     FWS's approval process began when the Department applied for an incidental take permit to allow it to undertake logging activities that will harm grizzly bears and bull trout.  As required by the Endangered Species Act, the Department prepared a habitat conservation plan—a measure designed to provide for mitigation of harmful development activities.  Montana Department of Natural Resources and Conservation, <u>Fish and Wildlife Service, Habitat Conservation Plan</u> (2010) ("HCP").  Properly developed and implemented, a programmatic-level HCP has the potential to benefit species by allowing permittees and FWS to minimize or modify proposed activities that would cause the most harm to species, prioritize protections in those areas most important to species survival, and ensure that protections are in place over the long term.  However, when such a large-scale plan

fails to include necessary species protections, the resulting damage is magnified over a widespread geographic area and for decades into the future.  In this case, the Department developed an HCP that falls into the latter category, locking in harmful logging and road building impacts to imperiled grizzly bear and bull trout populations for fifty years.

5.      In approving the Department's flawed HCP and issuing an incidental take permit for grizzly bears and bull trout, FWS violated the ESA.  Instead of ensuring against a likelihood of jeopardizing listed species and guaranteeing the maximum practicable mitigation against impacts to bull trout and grizzly bears, as required by the ESA, 16 U.S.C. §§ 1536(a)(2), 1539(a)(2)(B)(ii), the agency generally acquiesced to the Department's desires by  approving construction of 1,100 miles of new roads, delaying essential remedial actions on existing roads, allowing logging immediately adjacent to bull trout streams, and diminishing secure core habitat protections for grizzly bears over 39,600 acres—all in a permit with a fifty-year term.  BiOp IV-213, IV-204-05, IV-179, II-45.

6.      In addition, FWS failed to prepare an environmental impact statement for the Department's proposed forest-management activities that complied with the National Environmental Policy Act, 42 U.S.C. § 4332 ("NEPA").  The environmental impact statement, jointly prepared by FWS and the Department to meet both NEPA and Montana state law requirements (Montana Department of

3

Natural Resources and Conservation, Fish and Wildlife Service, <u>Habitat Conservation Plan Final Environmental Impact Statement</u> (2010) ("Final EIS")), failed to comply with NEPA in at least two respects. First, the Final EIS failed to take a "hard look" at the environmental impacts of the proposed action, including full consideration of the impacts in light of the effects of climate change on the affected species. Second, the Final EIS failed to evaluate a reasonable range of alternatives to the HCP, and did not analyze any alternative that would result in a conservation benefit to the species covered by the HCP.

7.     As FWS acknowledged, the direct impacts of the HCP are in addition to the significant new and expanding threats that bull trout and grizzly bears face from ongoing climate change. Global warming is likely to cause the shrinking and warming of streams as snowmelt and precipitation decrease, ambient air warms, and tree cover dwindles. Final EIS at 4-215—4-218. As cold-water habitat disappears, bull trout will become even more scarce and isolated. <u>Id.</u> at 4-218. Grizzlies, meanwhile, will be forced to search out new food sources as expanding pathogens and new, heat-tolerant species alter their foraging landscape. <u>Id.</u> at 4-438. Instead of giving these species room to respond to the demands of a warming climate, the Department's HCP increases harmful impacts on the species and further constrains their habitat options.

4

8.      At a critical moment when grizzlies and bull trout need maximum flexibility, FWS has locked in a regime for the next fifty years that will shrink and degrade crucial remaining habitat for these imperiled species, and it has done so without undertaking the requisite analysis of the environmental consequences of, and alternatives to, its actions.  FWS's approval of the Department's action violates the ESA and NEPA, and should be set aside by this Court.


**JURISDICTION, VENUE AND ADMINISTRATIVE REMEDIES**


9.      This action is brought pursuant to the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(C), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which waive defendants' sovereign immunity.  This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2201-02.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because the lead plaintiff resides in Lake County, within this District, and the lands that are the subject of the challenged action lie within this District.

11.     Plaintiffs have attempted to resolve their claims administratively by commenting on the draft conservation strategies, draft and final environmental

impact statements and HCP, and by providing defendants with notice of plaintiffs'

intent to sue on September 13, 2012, as required by 16 U.S.C. § 1540(g)(2).

## PARTIES

12.    Plaintiff Friends of the Wild Swan is a Montana non-profit

organization with its principal place of business in Swan Lake, Lake County,

Montana.  Friends of the Wild Swan is dedicated to the conservation of natural

resources and preserving the biological integrity of Montana state school trust

lands.  Friends of the Wild Swan has been involved in issues related to state lands

since 1987.

13.    Plaintiff Montana Environmental Information Center ("MEIC") is a

member-supported advocacy and public education organization based in Helena,

Montana, that works to protect and restore Montana's natural environment.  Since

its founding in 1973, MEIC has lobbied and litigated both at the state and federal

levels to prevent degradation of air and water quality and natural resources.

14.    Plaintiff Natural Resources Defense Council ("NRDC") is a non-

profit conservation organization that uses law, science, and the support of its

363,778 members, including 1,745 members in Montana, to protect the planet's

wildlife and wild places, and to ensure a safe and healthy environment.  NRDC and

its members have a longstanding interest in conserving threatened and endangered

6

species.  NRDC is headquartered in New York City, with additional domestic offices in Montana, Washington, D.C., Illinois, and California.

15.    All plaintiffs have long-standing interests in the preservation of endangered species and their habitat, both because they and their members place a high value on these species and because the presence of these species is essential to the healthy functioning of the ecosystems in which they evolved, and in which the plaintiffs and their members undertake numerous activities that rely on healthy ecosystem functions.  Plaintiffs actively seek to protect and recover endangered species through a wide array of actions including public education, scientific analysis and advocacy intended to promote achievement of healthy ecosystem functioning in Montana.

16.    Members of each of the plaintiff conservation groups have conservation and aesthetic interests in the lands and species that are the subject of the challenged action.  Plaintiffs' members use state land in western Montana for recreational pursuits, and particularly seek to conserve and enjoy bull trout and grizzly bears within areas that are covered by the HCP at issue.  The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, and wildlife preservation interests of the plaintiffs and members of the plaintiff organizations.

17.     Defendant Ken Salazar is the United States Secretary of the Interior. In that capacity, Secretary Salazar has supervisory responsibility over the United States Fish and Wildlife Service.  Defendant Salazar is sued in his official capacity.

18.     Defendant United States Fish and Wildlife Service is a federal agency within the Department of Interior.  FWS is responsible for administering the ESA, including issuing incidental take permits under ESA Section 10, 16 U.S.C. § 1539(a)(1) and federal regulations pursuant to ESA Section 4(d).

## THE ENDANGERED SPECIES ACT

19.     The ESA was enacted to "provide a program for the conservation of … endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  The ESA is a call to species protection: a commitment, in the words of the U.S. Supreme Court, "to halt and reverse the trend toward species extinction—whatever the cost" by rejecting the "economic growth and development untempered by adequate concern and conservation" that gave this country its legacy of extinctions.  Tennessee Valley Auth. v. Hill, 437 U.S. 153, 154 (1978); 16 U.S.C. § 1531(a)(1).

20.    Section 9 of the ESA and federal regulations pursuant to Section 4(d) of the ESA makes it illegal for any person—whether a private or governmental entity—to "take" any endangered or threatened species of fish or wildlife listed under the ESA.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.21(c), 17.31, 17.41(w) (applying take prohibition to bull trout), 17.40(b) (same for grizzly bears).  "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C § 1532(19).  FWS has defined "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102.

21.    Section 10 of the ESA and federal regulations pursuant to Section 4(d) of the ESA provide an exception to the ESA's take prohibition.  16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 17.32.  Under these provisions, a person or government agency whose activities will incidentally take endangered or threatened species can avoid take liability by applying in advance for an incidental take permit.  Id.  The incidental take permit has the potential to strengthen protections of the ESA by creating incentives to take early action to protect species.  For applicants, it is both procedurally demanding and substantively rigorous.  Ramsey v. Kantor, 96 F.3d 434, 439 (9th Cir. 1996).  Procedurally, it calls for the preparation of a habitat

conservation plan.  16 U.S.C. § 1539(a)(2)(A).  Substantively, it requires a finding by FWS that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking" and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  Id. § 1539(a)(2)(B)(ii), (iv).  Further, the ESA authorizes FWS to impose additional conditions, including reporting requirements, "deemed necessary and appropriate" to ensure that the taking will be incidental, that the applicant will minimize and mitigate the impacts of the taking to the maximum extent possible, and that the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.  Id. § 1539(a)(2)(B).

22.    Section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall … insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat for the species.  16 U.S.C. § 1536(a)(2).  Because FWS's issuance of an incidental take permit is an agency action, this provision requires FWS to ensure that the permit issuance will not jeopardize listed species—or, in the words of Section 7's implementing regulations, that the permit issuance is not "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the

reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

23.     To ensure compliance with the jeopardy prohibition, FWS must

prepare a biological opinion that details "how the agency action affects the species

or its critical habitat."  Id. § 1536(b)(3).  The opinion must include FWS's

determination "whether the action, taken together with cumulative effects, is likely

to jeopardize the continued existence of listed species."  50 C.F.R. § 402.14(g)(4).

In addition, the opinion must include any "reasonable and prudent alternatives"

necessary to avoid jeopardizing listed species.  Id. § 402.14(g)(5).  In preparing its

Biological Opinion and jeopardy determination, FWS must "use the best scientific

and commercial data available."  16 U.S.C. §1536(a)(2).

24.     If FWS concludes that the proposed incidental taking of endangered

or threatened species will not jeopardize the species, or that reasonable and prudent

alternatives would avoid such jeopardy, then FWS may issue an incidental take

statement.  Id. § 1536(b)(4).  The incidental take statement "specifies the impact of

such incidental taking" and "those reasonable and prudent measures that the

Secretary considers necessary or appropriate to minimize such impact" and sets

forth terms and conditions for implementing such measures.  Id.

25.     Pursuant to the ESA's framework, FWS in 2011 approved the

Department's HCP, prepared the Biological Opinion, with incidental take

statements for grizzly bears, lynx, and the three fish species, including the bull trout, and issued an incidental take permit for logging activities to be carried out by the Department on state trust lands in western Montana.  See BiOp; U.S. Fish and Wildlife Service, Record of Decision, Proposed Issuance of a Permit to Montana Department of Natural Resources Conservation, Authorizing Incidental Take of Endangered and Threatened Species on Forested Trust Lands in Western Montana (2011) ("ROD").

## THE NATIONAL ENVIRONMENTAL POLICY ACT

26.     The approval of an HCP and the issuance of an incidental take permit constitute a major federal action subject to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.  NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies consider significant aspects of the environmental impacts of their proposed actions, and to ensure that agencies will inform the public that environmental concerns have been considered in agency decision-making.

27.     NEPA requires federal agencies to prepare an environmental impact statement in connection with all "major Federal actions significantly affecting the

quality of the human environment."  42 U.S.C. § 4332(2)(C).  The required EIS must describe, among other things, "the environmental impact of the proposed action" and "alternatives to the proposed action."  Id. § 4332(2)(C)(i), (iii).  NEPA further provides that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  Id. § 4332(2)(E).  NEPA's implementing regulations explain that agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).

28.    The regulations further provide that "[a]gencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements."  Id. § 1502.24.

## BULL TROUT

29.    The bull trout, Salvelinus confluentus, historically thrived in almost all waters throughout the Columbia River basin and its headwaters in Montana and Canada, including lakes, large rivers, and small tributary streams.  Listed under the ESA as threatened in 1998, bull trout today persist mainly in small, isolated headwater lakes and streams, occupying less than half of their historic range.

13

30.     Bull trout are extremely sensitive to environmental disturbance because they have highly specific habitat requirements.  To successfully spawn, develop, and survive, bull trout require water that is very cold—five to nine degrees Celsius (or roughly forty-one to forty-eight degrees Fahrenheit)—and clean.  Embryos and juveniles require cold, sediment-free stream bottoms with small spaces between pebbles, which provide cover for juveniles to hide from predators and allow the flow of oxygenated water to nourish eggs deposited between these pebbles.  Bull trout are particularly sensitive to changes in stream cover, stream channel form and stability, blockage, modification, and other impediments in their migratory corridors.

31.     Land-use activities that degrade water quality, such as roading, logging, mining, irrigation, and grazing, have forced bull trout out of the main stems of rivers and into the smaller reaches, and have disrupted their pattern of migrations.  BiOp IV-16.  Thus threatened with genetic isolation, remaining bull trout populations are "at best stable and more often declining."  BiOp IV-24.

32.     FWS listed the Columbia River "distinct population segment" of bull trout ("DPS"), along with the Klamath River DPS, as threatened species in 1998. 63 Fed. Reg. 31,647 (June 10, 1998); see also 16 U.S.C. § 1532(16) (providing that "species" under ESA includes "distinct population segment of any species of vertebrate fish … which interbreeds when mature").  In 1999, the agency listed the

three remaining DPSs of bull trout, so that all populations of bull trout in the lower

forty-eight states are now protected by the ESA.  64 Fed. Reg. 17,110 (Apr. 8,

1999); 64 Fed. Reg. 58,910 (Nov. 1, 1999).  Though the listing now encompasses

all bull trout in the coterminous United States, FWS preserved the original DPS

designations for the Columbia River Basin and others because each DPS is isolated

from the others with no genetic interchange between them.  For the "purposes of

[ESA section 7] consultation and recovery planning, [FWS] will continue to refer

to these populations as DPSs.  These DPSs will serve as interim recovery units in

the absence of an approved recovery plan."  Id. at 58,912.  There is no approved

final recovery plan for bull trout.

33.      The bull trout that make up the Columbia River Basin DPS are

primarily resident fish that are restricted to isolated patches of marginal habitat in

headwater lakes and streams.  In a 2008 five-year review of bull trout status

prepared by FWS, FWS evaluated 121 bull trout "core areas" throughout all five

bull trout DPSs.  "Core areas" represents "the closest approximation of a

biologically functioning population unit for bull trout and are most often comprised

of several local populations, with the exception of those core area populations that

occur in isolated lakes that typically have only one spawning and rearing stream."

BiOp IV-3.  FWS determined the level of risk to each core area by evaluating six

variables: population abundance, distribution, population trend, threats,

15

environmental specificity and intrinsic vulnerability.  Fish and Wildlife Service,

Bull Trout 5-Year Review: Summary and Evaluation, 29 (April 24, 2008) ("Five

Year Review").  FWS evaluated the level of risk to each core area in conjunction

with the size of the population in that area, and determined the threat level to each

core-area population. Id. at 30.  FWS determined that all the Montana populations

of bull trout faced a level of threat that was either: (a) substantial, imminent threat;

(b) moderate, imminent threat; or (c) localized, substantial threat.  Id.  In a further

step, FWS considered these threat levels while taking into account the migratory

form of each particular bull trout population (that is, evaluating whether the core

area had trout that were migratory or resident, with migratory population

characteristics being superior for ensuring the persistence of the population), and

used this information to determine the risk level for each bull trout population.  Id.

FWS concluded that the populations in Montana were, primarily, either at risk or at

high risk.  Id. at 33.

34.     When FWS applied the "core area" classification to remaining bull

trout populations, FWS concluded that the "functional loss of any core area is

expected to represent an appreciable reduction in the likelihood of survival and

recovery of the bull trout … ."  Email from John Young, Bull Trout Coordinator,

FWS Region One to Wade Fredenberg (May 20, 2005).  This determination was

similar to the agency's earlier conclusion, under a different administrative

16

framework for analyzing bull trout populations, that the loss of any subpopulation "will be considered an appreciable reduction in the likelihood of survival and recovery of the DPS." Rock Creek Alliance v. U.S. Fish and Wildlife Serv., 390 F. Supp. 2d 993, 1000 (D. Mont. 2005).  The only significant difference between the two classifications is that the agency now allows "exceptions to this rule" as it applies to core areas, "and if these arise it will be important to carefully explain the lack of a significant contribution of the core area."  Email from John Young, Bull Trout Coordinator, FWS Region One to Wade Fredenberg (May 20, 2005).

35.     After a local population is extirpated, other bull trout are unlikely to colonize the vacant habitat.  The prospects for successful reintroduction are poor because bull trout from other areas have not evolved the adaptations necessary for survival in the vacant habitat.  This means that the loss of a subpopulation, or core area, is likely to be long-lasting and irrevocable in the time frame relevant to bull trout survival and recovery.  See 64 Fed. Reg. 58,910, 58,912.

36.     The most recent federal rule designating bull trout critical habitat was promulgated in 2010.  See 75 Fed. Reg. 63,898.  The HCP project area primarily affects bull trout critical habitat in three core areas: Stillwater, Swan, and North Fork Flathead—that is, these are the three core areas where activities undertaken pursuant to the HCP will have a high likelihood of influencing bull trout habitat. BiOp IV-269, BiOp IV-119.  Other critical habitat affected by the HCP includes

17

the following core areas: Bitterroot, Blackfoot, Flathead, Lower Clark Fork, Lower

Kootenai, Middle Clark Fork, Upper Clark Fork, Rock Creek and Upper Kootenai.

The HCP logging activities are expected to cause the greatest risk to two of the

factors affecting habitat quality: sedimentation and connectivity.  BiOp IV-275.

37.     As FWS recognized, roads are one of the greatest threats to bull trout.

See BiOp Appendix E at 4; IV-197.  When roads are cut into slopes, they change

the natural hillside drainage network, causing a series of impacts. First, during

storms, rain runs off roads and directly into streams.  See BiOp IV-197.  The rush

of water changes peak flows, carries chemicals, and physically alters the delicate

bank and channel features that bull trout depend on for survival.  See id.  Second,

as it travels, storm water erodes the hillside, causing landslides, gullying, and

slumps—and then literally carrying the eroded land into the river as sediment.  See

BiOp IV-197; IV-222-23; IV-228.  Sediment is deadly to bull trout because it clogs

their spawning gravel, which suffocates eggs and prevents fry from emerging.  See

BiOp IV-164; IV-20-21.

38.     FWS acknowledged that "bull trout strongholds primarily occur in

watersheds with little or no past timber harvest."  BiOp IV-31.  In fact, the

connection between intact streamside forest and healthy in-stream habitat is

straightforward and well documented.  See, e.g. BiOp IV-173.  Riparian tree stands

preserve the narrow temperature range that bull trout will tolerate by shading

streams in the summer and moderating cold in the winter.  See BiOp IV-173-174.

Timber harvest also affects stream temperature by decreasing streamside cover,

and by affecting soil and groundwater temperature.  BiOp IV-176.  Tree branches

and trunks fall into the river as "large woody debris," which provides the complex

forms of cover and habitat that bull trout need at every stage of their life cycle. See

BiOp IV-20.  Meanwhile, tree roots anchor the bank, stabilizing the physical

integrity of the channel and controlling sedimentation. Preferred bull trout

spawning habitat consists of low-gradient stream reaches with loose, clean gravel;

increases in fine sediment reduce egg survival and emergence.  See BiOp IV-21.

39.    Despite FWS's recognition of bull trout habitat needs and the threat

posed by road construction and logging, as described below, FWS approved

Department forestry practices that will increase threats to bull trout due to

sedimentation from new and existing roads and logging adjacent to important trout

streams.

**GRIZZLY BEARS**

40.    Like bull trout, grizzly bears face threats to their survival in areas

affected by the Department's forest management activities.  The grizzly bear is the

largest brown bear species occupying North America, typically weighing between

200 and 600 pounds.  Grizzly bears are distinguished from black bears by their larger size, longer curved claws, humped shoulders, and concave face.

41.     The history of the North American grizzly bear is one of widespread persecution by European settlers.  Since the arrival of Europeans in North America, the grizzly bear has been eliminated from all but approximately two percent of its original range in the lower forty-eight states.  The grizzly bear's range once included most of the western half of the United States.  As fur trapping, mining, ranching, and farming pushed westward, the grizzly was almost entirely eliminated from the Great Plains.  As mountainous areas were settled, logging and recreational development destroyed grizzly bear habitat.  Livestock depredation control, habitat deterioration, commercial trapping, and unregulated hunting also contributed to the grizzly's decline.  Between 1800 and 1975, the grizzly bear population shrank from an estimated 50,000 to 100,000 bears to fewer than 1,000 in the lower forty-eight states.

42.     In 1975, FWS determined that grizzly bears in the lower forty-eight states were in need of protection under the ESA as a "threatened" species, meaning a "species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20); see also 40 Fed. Reg. 31,734 (1975) (grizzly bear listing notice).

43.     Today, known grizzly bear populations persist in the United States in only four areas:  the Yellowstone ecosystem in southwest Montana, northwest Wyoming, and eastern Idaho; the Northern Continental Divide ecosystem in northwest Montana; the Cabinet-Yaak ecosystem in northwest Montana and northern Idaho; and the Selkirk ecosystem in northeastern Washington and northern Idaho.  Additionally, fewer than fifteen grizzly bears are believed to persist in the North Cascades of Washington.  Two of these grizzly population areas—the Cabinet-Yaak and Northern Continental Divide ecosystems— encompass state lands that are subject to the Department's HCP.

44.     Restoring grizzly bears from their imperiled status requires providing sufficient habitat, which, in turn, requires controlling roads.  FWS has explained that roads probably pose the most imminent threat to grizzly bear habitat today, and road management is one of the most powerful tools available to secure adequate effective habitat for grizzly bear populations.

45.     Grizzly bear mortality is directly related to increased human presence in bear habitat caused by roads for three reasons.  First, as more people enter grizzly bear habitat, there are more direct encounters between grizzly bears and armed humans.  These encounters most often result in dead bears, as a result of mistake, deliberate poaching, or self-defense.  In the lower forty-eight states, most grizzly bears die not from natural causes but because people shoot them.

21

46.     Second, some grizzly bears, especially females with cubs, avoid human activity and developments, including roads.  Human intrusion into bear habitat displaces these bears from preferred feeding and denning sites and forces them to seek food and shelter elsewhere—often in marginal habitats, where inadequate food resources may impact grizzly survival or reproduction. Displacement of female bears with cubs has significant implications for conservation and recovery of grizzly bears, because the reproductive rate of grizzly bear populations is tied to the nutritional status and stress levels of females, and because displacement from productive habitat significantly reduces cub survival rates.

47.     Third, not all grizzly bears are displaced by human activity.  After exposure to humans, some bears lose their natural fear of people.  These "habituated" bears are much more likely to seek out food from people and to be killed as a result.  Research on grizzlies in Yellowstone National Park indicates that habituated grizzly bears are more than three times more likely to be killed by humans than non-habituated bears.

48.     Scientific research has documented that grizzly bears, especially females, tend to avoid closed roads as well as open roads.  Accordingly, to prevent direct grizzly bear mortality, as well as mortality caused by displacement and habituation, it is necessary to limit all road types in grizzly bear habitat, including

22

open roads, restricted roads receiving limited use, and roads that have been administratively closed.

49.     Research has further indicated that grizzly bear use of areas declined as total road densities (i.e., both open and closed roads) exceeded 2 miles per square mile, and as open road densities exceeded 1 mile per square mile.  Areas with high road densities represent extremely compromised grizzly bear habitat.

50.     This scientific research indicates the importance of managing three parameters to avoid displacing grizzly bears from important habitats and to reduce grizzly bear mortality risks: (1) open road density, (2) total road density, and (3) areas free of motorized access and high levels of human use, also known as "core area" habitat.  This research has been incorporated by the U.S. Forest Service into the forest management plans of the national forests in northwestern Montana.  For example, the Forest Plan for the Flathead National Forest contains standards for managing grizzly bear habitat: (1) limiting high density open motorized access (defined as more than one mile of open motorized access per square mile of Forest) to no more than nineteen percent of each grizzly bear management unit; (2) limiting high density total motorized access (defined as more than two miles of total motorized access per square mile of Forest) to no more than nineteen percent of each such unit; and (3) establishing security core areas that equal or exceed sixty-eight percent of each such unit.  Forest Service, <u>Flathead National Forest</u>

23

<u>Land and Resource Management Plan</u> at II-7 (Updated Aug. 2001).  These grizzly

bear management units approximate the home range size of a female grizzly bear.

Pursuant to a 2011 amendment to the Kootenai, Lolo and Idaho Panhandle

National Forest Plans, the Forest Service manages similar grizzly bear habitat units

under a similar approach, limiting high density open motorized access to no more

than thirty-three percent of each management unit, limiting high density total

motorized access to no more than twenty-six percent of each management unit, and

establishing security core areas that equal at least fifty-five percent of each

management unit.  Forest Service, Record of Decision, <u>Forest Plan Amendments</u>

<u>for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly</u>

<u>Bear Recovery Zones</u> at 9 (2011).  Although the required percentages vary, in both

cases secure, unroaded "core" habitat is an integral component of land

management to ensure grizzly bear survival.

        51.     Nonetheless, as described below, FWS approved the Department's

plan to eliminate "core area" habitat protections and build miles of new roads

within the Stillwater and Coal Creek State Forests—together comprising the

"Stillwater Block" of Department lands—within the Northern Continental Divide

Ecosystem that is one of the bears' last strongholds in the lower forty-eight states.


**THE CHALLENGED AGENCY ACTIONS**

52.     The agency actions challenged in this case threaten to continue—and even to worsen—compromised conditions for already-imperiled populations of grizzly bears and bull trout occupying certain state trust lands in Montana.  The HCP project area encompasses roughly 548,500 acres, and includes trust land administered by the Department of Natural Resources and Conservation for trust beneficiaries in three Montana land offices: the Northwestern Land Office (approximately 273,400 acres), the Southwestern Land Office (approximately 161,920 acres) and the Central Land Office (approximately 113,180 acres).  The HCP project area includes two large blocks of land owned by the Department, and scattered parcels across the three land offices.  The blocks include the Stillwater Block, which includes the Stillwater and Coal Creek State Forests, and the Swan River State Forest.  Much of the state trust land (1,264,000 acres) was not included in the HCP project area, primarily because these lands are non-forest lands (719,000 acres), there is little timber to manage over the incidental take permit term (359,600 acres, all in the Conrad Unit), or HCP species habitat is not present (117,000 acres).

53.     FWS published a notice in the Federal Register in April 2003 stating that the agency intended to prepare an EIS evaluating issuance of an incidental take permit based on the HCP that was then being drafted by the Department.  68 Fed. Reg. 22,412 (April 28, 2003).  The Department released the full HCP in draft form

in April 2009 along with the Department's incidental take permit application, then

released the final HCP in September 2010.  To merit an incidental take permit, the

HCP was required, by Section 10(a)(2)(A) of the ESA, to specify the impacts that

are likely to result from the taking of listed species and commit the Department to

avoid, minimize, and/or mitigate the impacts of the planned forest management

activities' incidental take on the identified species.  16 U.S.C. § 1539(a)(2)(A).

The Department's HCP identified five species for which impacts would be

addressed: grizzly bear, Canada lynx, bull trout, westslope cutthroat trout and

interior redband trout.  Grizzly bears, lynx, and bull trout are currently listed under

the ESA.  Westslope cutthroat trout and interior redband trout are currently

proposed for listing.  The Department drafted the HCP, with "detailed guidance

and technical assistance" provided by FWS.  HCP 1-4.

54.    The Department proposed in the HCP that the incidental take permit

be issued for a period of 50 years, stating that regulatory certainty under the ESA

"will help [the Department] plan forest management activities with the reassurance

that those activities will not be subject to additional ESA regulatory restrictions

due to the presence of a listed HCP species."  HCP 1-15.

55.    The HCP covers a set of "forest management activities" including

timber cutting (meaning commercial logging, salvage logging, and thinning

activities), other forest management activities (including slash disposal, prescribed

26

burning, site preparation, reforestation, fertilization, inventory and weed control),

roads (including forest management road construction, reconstruction,

maintenance, use, and associated gravel quarrying for road surface materials, and

installation, removal and replacement of stream crossing structures), and grazing

licenses.  Logging under the HCP includes issuance of timber permits and the

Montana Board of Land Commissioners' (the "Land Board") approval of timber

sales; the Land Board issues permits, and makes sales, to private contractors whose

activities are administered by the Department.

56.    FWS published its draft EIS in the Federal Register on June 26, 2009,

and allowed public comment until October 9, 2009.  FWS completed the Final EIS

in September 2010.  FWS jointly prepared the Final EIS with the Department to

meet requirements both under NEPA and Montana's state-law NEPA analogue, the

Montana Environmental Policy Act, Mont. Code Ann. § 75-1-201(1)(b)(iv).  FWS

was the lead agency for the NEPA portion, and the Department for the Montana

state law portion.  Final EIS ES-1.  The Final EIS addressed a planning area that

included all lands in the three Montana land offices, including those not covered by

the HCP for the reasons listed in paragraph 52, supra.  The Final EIS evaluated the

HCP and three alternatives: (i) a no-action alternative, (ii) an alleged increased

conservation alternative, and (iii) an increased management flexibility alternative.

FWS and the Department each identified, separately, the HCP alternative as their

27

preferred alternative.  The agencies identified the alleged increased conservation alternative as the "environmentally-preferred alternative."

57.     The FWS Montana Field Office released the Biological Opinion in December 2011.  The Biological Opinion was prepared to evaluate the proposed issuance of the incidental take permit and to inform FWS's opinion that the permit would not jeopardize the survival of the affected species.  The Biological Opinion addressed each HCP-covered species, discussing, <u>inter alia</u>, the status of the species, the effects of the logging activities on the species, and conservation recommendations.

58.     FWS issued a record of decision at the end of 2011, approving the issuance of the incidental take permit in accordance with the management practices outlined in the HCP.  ROD at 27.

59.     In comments to FWS and the Department, Plaintiffs observed that the HCP fails to mitigate the harmful impacts of the Department's planned forest-management activities to the maximum extent practicable, and fails to adequately protect bull trout, grizzly bears, and their habitat.  Likewise, Plaintiffs observed that FWS's Final EIS failed to fully analyze the environmental impacts of the proposed action, particularly in light of the exacerbating impacts of global warming, and failed to analyze a reasonable range of alternatives to the proposed action.

28

**A. Failure to Mitigate to the Maximum Extent Practicable**

60.    The HCP does not include measures to minimize the harm to bull

trout and grizzly bears from the Department's proposed logging activities "to the

maximum extent practicable."  16 U.S.C. § 1539(a)(2)(B)(ii).

61.    FWS concluded that, notwithstanding conservation commitments in

the HCP, incidental take of grizzly bears in the form of harm or harassment would

occur due to high total road densities on 50,833 acres of state land in the Stillwater

Block, BiOp at II-126; and high open road densities on 45,560 acres of state land

in the Stillwater Block, BiOp at II-127.  Permitted activities would take bull trout

due to sedimentation from forest roads on 207.2 stream miles in the project area,

BiOp at IV-295; and sedimentation from livestock grazing on 81.6 stream miles in

the project area, BiOp at IV-297.  As detailed above, sedimentation causes "harm"

to bull trout "spawning, rearing, overwintering, and migratory habitats such that

[bull trout] are unable to meet their feeding, breeding, and/or sheltering needs."

BiOp at IV-294.  Bull trout will suffer these effects in all of the bull trout core

areas in the HCP project area, save one core area where bull trout do not occur.

BiOp at IV-297.

62.    The Department rejected mitigation measures that would provide for

less logging and greater conservation commitments for bull trout and grizzly bears

as being impracticable because they would yield less revenue.  See, e.g., Final EIS

29

at 3-33 (rejecting alternative of applying more protective federal conservation standards to state trust lands because doing so "would decrease the opportunity for timber harvest and would result in a revenue loss"); id. (rejecting alternative that would require less road building because it "would likely result in increased costs and lost revenue to the trust beneficiaries, thereby not meeting [the Department's] purpose and need"); id. at 6-6 (explaining that protecting secure grizzly bear habitat in the Stillwater Block would impede the Department's "ability to meet its trust mandate to generate revenue for the trust beneficiaries from those lands"); see also HCP at 1-7 (describing Department's "practicability considerations"). This impracticality rationale, however, is not supported by any economic analysis and, furthermore, is based on an unduly rigid conception of the state's trust mandate.

63.    FWS accepted the Department's unsupported assertion that greater conservation commitments are not feasible because they would reduce the amount of revenues generated for the trust. However, neither the Department nor FWS provided any analysis to support the conclusion that additional conservation measures are impracticable in light of the Department's multi-faceted trust obligation. The Department identified "practicability considerations" in the HCP, HCP at 1-7, but failed to apply those considerations in an objective and analytical fashion anywhere in the HCP or Final EIS. Moreover, even if the Department believed that alternatives and mitigation measures that would diminish economic

return from forested state trust lands are infeasible, "FWS must make an independent determination of practicability and make a finding that the impacts of the taking will be minimized and mitigated 'to the maximum extent practicable.'" Southwest Ctr. For Biological Diversity v. Bartel, 470 F. Supp. 2d 1118, 1158 (citing 16 U.S.C. § 1539(a)(2)(B)(ii); Gerber v. Norton, 294 F.3d 173, 184 (D.C. Cir. 2002)).  FWS did not make this independent determination, and instead relied solely on the Department's assertions, which are not supported by state law.

64.     In fact, contrary to the assumption underlying the Department's impracticability assertion, the Department's management of state lands is bound by "the guiding principle" that:

> these lands … are held in trust for the support of education and for the attainment of other worthy objects helpful to the well-being of the people of this state … .  The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the state.

Mont. Code Ann. § 77-1-202.  This duty embodies more than economic factors. See Friends of the Wild Swan v. Dep't of Natural Res. and Conservation, 2005 MT 351, ¶ 21, 330 Mont. 186, 127 P.3d 394 ("Although the statutory directive to 'secure the largest measure of legitimate and reasonable advantage' certainly includes economics, the phrase is not limited in purpose to financial return").  The Land Board's obligation is "to protect the best interests of the state ... which necessarily includes considering consequences to wildlife and the environment."

31

<u>Ravalli County Fish and Game Ass'n</u>, 273 Mont. 371, 379, 903 P.2d 1362, 1638.

Indeed, Department regulations require it to "participate in recovery efforts of

threatened and endangered plant and animal species."  Admin. R. Mont.

36.11.428(1).  Accordingly, the Department's trust obligation is not just about

maximizing revenue, but also about protecting and preserving unreplenishable

resources.  FWS failed to consider this relevant factor in approving the challenged

permit.

65.     In short, the Department's claim that additional measures to minimize

harm to bull trout and grizzly bears were "impracticable"—and FWS's reliance on

this assertion—was unsupported by any factual analysis or legitimate legal

constraint.

### B. Failure to Protect Bull Trout and Bull Trout Habitat

66.     FWS issued an incidental take permit on the basis of an HCP that

insufficiently mitigates the impacts of forest-management activities on bull trout

and their habitat.

67.     FWS frankly acknowledged that an increase in roads will damage bull

trout and their habitat, including through sedimentation that smothers eggs and fry.

<u>See</u> BiOp IV-289.  Nevertheless, FWS approved the Department's forest

management plan, which will increase road density by thirty to forty percent in the

project area.  <u>See</u> BiOp IV-213; BiOp IV-218, Table IV-13.  FWS claimed that this

increase in roads will not jeopardize bull trout because it will be offset by improvements to existing roads.  See BiOp IV-286

68.     The HCP's promised improvement to existing roads is too little, too late.  The Department will spend the first ten years of the plan merely inventorying existing roads.  Only after this lengthy warm-up will it begin to develop mitigation measures.  See BiOp IV-204; IV-216.  Indeed, the HCP gave the Department fifteen years to address just those roads most in need of improvement: "high risk sites" in bull trout watersheds.  See BiOp IV-229; IV-205.  Meanwhile, the HCP permits new roads to be built, degrading bull trout habitat below baseline conditions.  See BiOp IV-289.  These new road-building impacts will harm bull trout cumulatively with existing roads requiring remediation, because existing roads and their threat to bull trout need not be addressed before new road construction commences.  This combination of impacts paints a grim picture for bull trout survival.  The bull trout life cycle is typically shorter than fifteen years, and bull trout spawn for only a few short years during their lifespan.  The proposed logging activities affect bull trout at all stages of their life cycle, but particularly affect early stages by increasing sedimentation that can suffocate eggs and prevent fry from emerging.  The combination of existing and new road impacts will affect multiple bull-trout spawning efforts before any remediation need occur under the plan approved by FWS.  By the time the Department is finally able to begin its

33

long-term road mitigation measures in a particular area, these measures will be in vain if there are no bull trout remaining in affected streams. FWS failed to consider this important aspect of the problem it confronted.

69.     FWS's analysis of the effect of the Department's forest-management activities on bull trout was also flawed with respect to proposed logging within riparian buffer zones that are key to bull trout survival. In an attempt to protect the "important riparian functions" provided by streamside forest, the HCP establishes a fifty-foot no-harvest buffer beside streams supporting bull trout. See BiOp IV-178. However, this buffer is "no-harvest" in name only: up to twenty percent of the so-called no-harvest zone may be logged under the plan. BiOp IV-179. FWS's summary dismissal of the negative impacts of this "limited" logging—in riparian areas it acknowledges as sensitive—was arbitrary.

70.     By way of rationale, FWS stated that the Department will conduct logging in the no-logging zone "in order to emulate natural disturbance regimes due to fire, insect, and disease infestations." Id. However, FWS provided no support for its inference that emulation of natural disturbances benefits the forest. In fact, the use of the term "emulation of natural disturbances" here is misleading: all Department logging activity is claimed to "emulate natural disturbance" even though it includes logging methods representing a range of "treatments," including clearcutting. BiOp I-10. Meanwhile, FWS acknowledged that, "[r]egardless of the

34

buffer size, the effectiveness of a buffer may be diminished when the riparian

vegetation community is exposed to disturbance, either through natural means or

manmade disturbance." BiOp IV-175-176. Further, FWS ignored the fact that

while the Department's logging activities within the riparian buffer zone may

"emulate natural disturbance[s]," BiOp at IV-179, these disturbances will be in

addition to, not in place of, natural disturbance events including fire and flooding

that already occur. FWS's failure to consider these cumulative impacts is arbitrary

and capricious.

71.     Instead of analyzing the impacts of the Department's plan to log trees

in the no-logging zone—an action which it acknowledges will lower buffer

effectiveness—FWS merely dismissed these impacts as "minimal" or "negligible,"

in part because such logging will "still be subject to the requirements of the

[Streamside Management Zone] Law," which requires minimum tree retention,

prohibits clearcutting in the immediate riparian area, and protects bank-edge trees

and trees in the stream. BiOp IV-190, IV-241. However, the best available

science does not support reliance on the Streamside Management Zone Law—

which allows logging up to fifty percent of trees in a Streamside Management

Zone—to protect bull trout. See, e.g. Belt et al. 1992 (the scientific literature does

not support, as protective of streams and fish, forest management regimes

involving selective removal of vegetation from riparian buffer strips); Murphy

35

1995 (scientific understanding of buffer widths has evolved; whereas only stream temperature was considered in the past, scientists now understand that riparian zones are also essential for sediment filtering and large woody debris recruitment; a protective forest management regime takes into account multiple, landscape-specific factors); Chamberlin 1991 (scientific understanding of buffer widths has evolved; buffer zones that are based on simplistic criteria and that do not consider biophysical processes are outdated).  FWS failed to address these admonitions regarding the Streamside Management Zone Law, even though they appear in the very scientific literature upon which the agency purported to rely.  BiOp IV-305; IV-310; IV-335.

72.     The HCP project area directly affects thirteen bull trout core areas in the Columbia River DPS, and contains 85.3 stream miles of designated critical habitat.  BiOp IV-6.  Of the thirteen affected core areas, the HCP primarily affects three core areas containing bull trout critical habitat (the Stillwater, Swan, and North Fork Flathead core areas) and activities undertaken pursuant to the HCP will have a high likelihood of influencing the habitat in these core areas.  BiOp IV-269, BiOp IV-119.  The populations of the Swan and Flathead Lake core areas are currently considered "at risk"; the Stillwater core area population is at high risk. Five Year Review at 33.  The HCP activities therefore threaten the survival and recovery of at-risk bull trout populations in these core areas, as well as, to a lesser

extent, the ten other core areas affected by the HCP logging activities.  BiOp IV-119.

73.     For all of these reasons, FWS's Biological Opinion and incidental take permit concerning bull trout are arbitrary and unlawful.

## C. Failure to Protect Grizzly Bears and Grizzly Bear Habitat

74.     FWS issued an incidental take permit on the basis of an HCP that insufficiently mitigates the impacts of forest-management activities on grizzly bears and their habitat and defies the best available scientific information about grizzly bear habitat needs.

75.     Of the only five areas in the lower forty-eight states where grizzly bear populations are known to exist, two are affected by the challenged actions. The Northern Continental Divide Ecosystem and the Cabinet-Yaak Ecosystem contain state lands that are covered by the HCP, though the majority of the HCP project area is in the Northern Continental Divide Ecosystem.  FWS found that there are an estimated 765 grizzly bears in the Northern Continental Divide Ecosystem.  BiOP 11-23.  FWS found that although the Northern Continental Divide Ecosystem bear population is increasing (at a mean annual rate of three percent), "[h]uman-caused mortality remains an important concern for the recovery of grizzly bears."  BiOp II-29, II-23.  The Biological Opinion further stated that logging activities on state lands in the Northern Continental Divide Ecosystem may

37

result in grizzly bear mortality due to high road densities and subsequent decreases in secure habitat, habitat fragmentation and destruction of habitat for denning and foraging, and increased risk of human/bear encounters.  BiOP II-30.

76.     Despite these concerns, in developing the HCP the Department abandoned the well-established "core area" grizzly bear management approach in favor of a "seasonally secure" and "quiet" area approach to grizzly bear management in the Stillwater Block in the Northern Continental Divide Ecosystem.  FWS admitted in the Biological Opinion that "[s]ecure habitat is important to the survival and reproductive success of grizzly bears, especially adult female grizzly bears."  BiOp II-16.  Secure habitat for grizzly bears is referred to as core areas, and is specifically defined by the Interagency Grizzly Bear Committee as "areas that are at least 0.3 mile from any open road or motorized trail and that receive no motorized use of roads or trails during the period they are considered secure habitat (typically at least 10 years)."  BiOp II-16-17.

77.     The Department previously protected core grizzly bear habitat in the Stillwater Block, maintaining security core areas "intact for periods approximating 10 years, to the extent practicable."  Admin. R. Mont. 36.11.432(1)(d).  The HCP substantially weakened this protection. The HCP abandoned "core area" protections for grizzlies in the Stillwater Block to allow more logging in this area. See BiOP II-87.  Instead of providing core grizzly bear habitat, the Department's

HCP contemplated a combination of seasonally secure areas and "quiet areas." Id. Seasonally secure areas will be managed on a schedule of "four years of management and eight years of rest." Id. However, "low-intensity" forest management activities and allowances for salvage logging will continue to be allowed even during rest periods, except as restricted during spring. Id. Instead of disallowing all motorized use in core areas for ten years at a time, according to the Biological Opinion, "this approach would focus on minimizing the potential for disturbance in large blocks of habitat during key periods of the year, and on limiting the frequency with which large-scale disturbance (e.g., commercial forestry) may occur." Id. This is a significant loss of protection for grizzlies. FWS acknowledged that "core" grizzly habitat will decrease under the HCP, "represent[ing] a possible increased risk of mortality to grizzly bears due to encounters with humans, along with an increase in the amount of otherwise suitable feeding, breeding, or sheltering habitat that grizzly bears might avoid." BiOp at II-89. Nevertheless, FWS concluded that seasonal road restrictions and the proposed "quiet area" approach will satisfy grizzly bears' habitat requirements. Id. at II-89-90.

   78.    FWS failed to support its conclusion regarding grizzly bear habitat requirements with scientific evidence. The "rotating quiet areas" and "seasonally secure areas" approaches were subjected to a peer review when first proposed for

the U.S. Forest Service's Flathead National Forest Plan more than a decade ago.

The peer review concluded that the seasonal divisions were not properly based on

bear biology, were insufficient to protect grizzly bears in the fall, and most

significantly that "there appears to be no data on the effectiveness of seasonally

closed roads" and, indeed, available data suggest that they are ineffective to protect

grizzly bears.  McLellan et al., "Peer Review of the Motorized Access

Management Strategies for Grizzly Bear Habitat in the Northern Continental

Divide Ecosystem" (Sept. 19, 2000) ("Peer Review").  Based on this peer review,

federal land managers in the Flathead National Forest opted to maintain core area

protections, which are supported by a large body of science, rather than adopting

the less-protective seasonally secure areas/rotating quiet areas approach that defies

this body of science.  FWS failed to meaningfully address the criticisms of the

HCP approach in the peer review, citing it only so far as it stated that there were

some ways the "core area" approach could fail to protect bears.  BiOp II-85.  FWS

stated that, unlike the "core area" approach, a "seasonally secure approach" is

"much more complex and relied on several assumptions, risks, and uncertainties,"

and therefore "most land managers" maintained the core area approach.  Id.  FWS

did not directly address the conclusion of the peer review that an approach such as

that taken in the HCP would defy bear biology and available scientific data.  FWS

therefore ignored critical information in approving the challenged HCP and issuing the challenged incidental take permit.

79.     FWS asserted in the Biological Opinion that harms to grizzly bears under the HCP will be temporary and grizzly bears may utilize other habitat. However, even short-term or seasonal human activity may cause grizzly bears to avoid areas of high road density, which is true even if the roads are closed to public travel.  R. D. Mace and J.S. Waller, <u>Final Report: Grizzly Bear Ecology in the Swan Mountains, Montana</u> 1997, at 72-73; Lee Metzgar, <u>A Review Of: Rationale and choices made in the review and development of an access direction proposal for the [Northern Continental Divide] grizzly bear ecosystem</u>, Nov. 30, 1998 at 8 ("we find abundant and convincing evidence that all road densities of all traffic levels displace bears in all seasons. …the pattern of avoidance of roads is consistent and convincing").  In other words, the best available scientific information indicates that seasonal closures do not benefit grizzly bears, while core habitat protections do.  FWS failed to specifically address these criticisms of the HCP approach to grizzly bear management.

80.     FWS also failed to support its conclusion that the HCP's concededly harmful impacts are mitigated to the maximum extent practicable.  The Final EIS contains the Department's justification for abandoning core secure habitat protections in the Stillwater Block because more protective management would

41

impede the Department's ability to "meet its trust mandate to generate revenue for

the trust beneficiaries from those lands."  Final EIS at 6-6.  The Department

rejected an alternative that would require fewer new roads because doing so

"would decrease the opportunity for timber harvest and would result in a revenue

loss."  Id. at 3-33.  As discussed supra, however, the mere fact that greater

protection of grizzly bear habitat would decrease revenues does not mean that the

Department has mitigated "to the maximum extent practicable."  16 U.S.C. §

1539(a)(2)(B)(ii) (emphasis added).

81.    For all of these reasons, the conclusions FWS reached in the

Biological Opinion and incidental take permit concerning grizzly bears are

arbitrary and unlawful.

### D. Failure to Prepare an Adequate EIS

82.    The Final EIS was prepared to evaluate the environmental impacts of

the activities described in the HCP, as well as alternative management program

designs.  As is true with the Biological Opinion, in drafting the Final EIS, FWS

failed to take a hard look at the environmental impacts of the HCP activities,

particularly the impacts of the Department's proposed logging and road building

on bull trout and grizzly bears.

83.    The Final EIS also failed to fully consider the HCP environmental

impacts against a backdrop of the environmental changes predicted in the region

during the next fifty years due to climate change.  The Final EIS acknowledged

that global warming will significantly reduce cold-water fish habitat:

> [With] the combination of diminished snowpacks feeding cool
> water to rivers and streams, higher temperatures of the air and
> water, more frequent and larger wildfires, and the proliferation
> of disease that can accompany these changes, global warming
> has the potential to transform and reduce trout habitat (Kinsella
> et al. 2008). A probabilistic risk assessment conducted for the
> effects of future climate change on United States cold-water
> habitat in the Rocky Mountains indicated median overall
> reductions in the amount of cold-water fish habitat of
> approximately 20, 35, and 50 percent in 2025, 2050, and 2100,
> respectively (Preston 2008).

FEIS at 4-218.  The global-warming threat to bull trout is even more pronounced

than for other fish species because optimal stream temperatures for bull trout are

substantially lower than those for other salmonids..  See id. at 4-231.  Thus, FWS

properly concluded that "[g]lobal climate change may ultimately be a significant

threat to the persistence of native fishes because it will add to the current adverse

effects of invasive aquatic species and habitat degradation while increasing water

temperatures to potentially unsuitable thresholds (Williams et al. 2007)."  Id. at

247.

     84.    Nevertheless, FWS's analysis in the Final EIS of the HCP's

environmental consequences is entirely disconnected from these dire warnings

regarding the impacts of global warming on bull trout.  Rather than analyzing the

impacts to bull trout of the Department's proposed logging and road-building

against this radically changing climatic backdrop, FWS accepted the Department's designation of climate change as a potential "changed circumstance" to be dealt with at a later time, after the harm has been done and its extent is revealed.  Id. at 4-389; see also id., App. G at G-45; HCP at 6-13.  Thus, the Final EIS simply noted that "several of the [HCP] commitments that affect [bull trout habitat] factors are adaptable if existing conditions change substantially due to climate change," such as riparian harvest thresholds and best management practices to limit stream sedimentation.  Final EIS at 4-298.  This approach contemplates waiting for conditions to change before making adjustments rather than forecasting likely changed conditions at the outset and crafting management options to head off impacts to affected species.  By the time mitigation adjustments can be implemented, impacts from logging that make the species more vulnerable to climate change will have occurred under the plan, and their impacts will be irrevocable.  The Final EIS contains no impacts analysis based on a projection of likely climate-change impacts, nor any analysis of whether voluntary management adjustments would be effective, or, if they are ultimately adopted, whether they would be "too little, too late."

85.    The Final EIS is also flawed because it arbitrarily rejects feasible alternatives to the HCP, and does not consider a true "conservation alternative."  The Final EIS evaluated four alternatives, including the no action alternative and

the preferred alternative.  Notably, all four alternatives would result in more roads

on trust lands within the HCP project area.  The Final EIS identified Alternative 3

as the "increased conservation" alternative, but Alternative 3 represented a decline

from the status quo in key habitat parameters for the HCP-covered species.  For

example, the so-called "increased conservation" Alternative 3 would result in the

construction of 1,035 miles of new roads—a fifty percent increase over existing

conditions.  Under all alternatives, including Alternative 3, the Department plans to

reduce core habitat security areas for grizzly bears, and increase open road

densities.  With respect to the HCP fish species, Alternative 3 also fails to deliver

enhanced conservation.  According to the Final EIS, "the additional riparian

protection provided by Alternative 3 is not expected to provide substantial

differences in [stream] temperature conditions compared to the other alternatives."

Final EIS 4-287.  In short, while Alternative 3 poses the lowest threat to the HCP-

covered species of all the alternatives studied in the draft EIS, it still diminishes,

rather than improves, habitat conditions for HCP-covered species.  This does not

reflect "increased conservation."  Absent from the environmental analysis is any

alternative establishing conservation measures and habitat standards more

protective of the HCP species than the status quo.

## FIRST CAUSE OF ACTION
### [ESA – APPROVAL OF HCP THAT FAILS TO MINIMIZE IMPACTS TO THE MAXIMUM EXTENT PRACTICABLE]

86.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 85.

87.     FWS failed to require the Department to minimize the harm to bull trout and grizzly bears caused by the state's proposed logging activities "to the maximum extent practicable."  16 U.S.C. § 1539(a)(2)(B)(ii).

88.     FWS acknowledged that more protective alternatives and extensive mitigation was available, but nonetheless failed to require such measures based upon its acceptance of the Department's assertion that such measures would cause the Department to violate its statutory obligations to secure revenue for the public trust.

89.     Because the Department's claim that additional measures to minimize harm to bull trout and grizzly bears would be impracticable is unsupported by any factual analysis or legitimate legal constraint, FWS's apparent determination that the Department will mitigate harm to species "to the maximum extent practicable" was arbitrary and capricious, and violated the ESA and APA.  16 U.S.C. § 1539(a)(2)(B)(ii); 5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION
### [ESA – APPROVAL OF HCP/INCIDENTAL TAKE PERMIT THAT ARBITRARILY ASSESSES IMPACTS TO BULL TROUT]

90.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 89.

91.    FWS's approval of the Department's HCP and the issuance of the

incidental take permit was arbitrary and capricious with respect to its evaluation of

impacts to bull trout.

92.    FWS arbitrarily determined that the Department's proposed logging

and road-building in bull trout habitat "will not appreciably reduce the likelihood

of the survival and recovery of the species in the wild."  16 U.S.C. §

1539(a)(2)(B)(iv).  In so doing, FWS arbitrarily and unlawfully relied upon

hypothetical improvements to existing roads that will not take place for many years

while dismissing near-term harm to bull trout due to new road construction that

threatens the continuation of affected bull trout populations.  FWS also arbitrarily

dismissed harm to bull trout due to logging within the "no-harvest" riparian buffer,

which in addition to harvest from natural disturbance events including fire and

flooding, appreciably reduces the likelihood of the survival and recovery of bull

trout.

93.    Further, FWS arbitrarily failed to impose "necessary and appropriate"

conditions to conserve bull trout on state lands covered by the HCP, id. §

1539(a)(2)(B), and failed to require the Department to mitigate harm to bull trout

"to the maximum extent practicable," id. § 1539(a)(2)(B)(ii), even though feasible

alternatives were available.

94.     FWS's approval of the HCP and issuance of an incidental take permit were therefore arbitrary and capricious, and contrary to the ESA, in violation of the APA, and must be set aside.  See 16  U.S.C. § 1539(a)(2)(B); 5 U.S.C. § 706(2).

## THIRD CAUSE OF ACTION
[ESA – ISSUANCE OF BIOLOGICAL OPINION
THAT ARBITRARILY ASSESSES IMPACTS TO BULL TROUT]

95.     Plaintiffs hereby reallege and incorporate Paragraphs 1 through 94.

96.     FWS's Biological Opinion was arbitrary and capricious with respect to its evaluation of impacts to bull trout.  The ESA required FWS to rationally determine that the proposed HCP and incidental take permit were "not likely to jeopardize the continued existence" of the bull trout.  16 U.S.C. § 1536(a)(2).  FWS failed to do so.

97.     FWS's Biological Opinion must analyze the effect of the entire agency action, including near-term impacts where planned mitigation measures are delayed.  FWS's no-jeopardy determination arbitrarily dismissed near-term impacts to bull trout due to new road construction on the basis of improvements to existing roads that will not occur for many years.  FWS failed to fully consider the impact of delayed mitigation in light of the bull trout life cycle—without short term mitigation, some bull trout populations may be eliminated before mitigation measures can be implemented.

98.    In addition, FWS's Biological Opinion arbitrarily dismissed the impacts of logging within the "no-harvest" riparian buffer, even though the best available science indicates that such activities may appreciably reduce the likelihood of the survival and recovery of bull trout.  Moreover, FWS failed to consider the cumulative aspect of the Department's proposed logging activities within the riparian buffer zone, which are in addition to natural disturbance events including fire and flooding.

99.    FWS's Biological Opinion was therefore arbitrary and capricious, and contrary to the best available science.  See 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION
### [ESA – APPROVAL OF HCP/INCIDENTAL TAKE PERMIT THAT ARBITRARILY ASSESSES IMPACTS TO GRIZZLY BEARS]

100.   Plaintiffs hereby reallege and incorporate Paragraphs 1 through 99.

101.   FWS's approval of the Department's HCP and issuance of the incidental take permit was arbitrary and capricious with respect to its evaluation of impacts to grizzly bears in the Stillwater Block.

102.   FWS arbitrarily assessed impacts due to the HCP's abandonment of "core" area protections for grizzly bears in the Stillwater Block.  FWS approved the HCP's grizzly bear management approach that utilizes a combination of seasonally secure areas and quiet areas, even though neither the Department nor

49

FWS supplied any science to support FWS's conclusion that this approach would sufficiently prevent the logging and road-building activity in the Stillwater and Coal Creek state forests from appreciably reducing the likelihood of the survival and recovery of bears.  Indeed, FWS disregarded science solidly supporting the opposite conclusion.

103.   Thus, FWS arbitrarily determined that "the taking" due to the Department's logging and road-building "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  16 U.S.C. § 1539(a)(2)(B)(iv).

104.   FWS also arbitrarily failed to impose "necessary and appropriate" conditions to conserve grizzly bears in the Stillwater Block, id. § 1539(a)(2)(B), and arbitrarily failed to require the Department to mitigate harm to grizzly bears "to the maximum extent practicable," id. § 1539(a)(2)(B)(ii), even though feasible alternatives were available that would result in less harm to grizzly bears—namely alternatives that would at least preserve a portion of the pre-existing "core" area protections within the Stillwater Block, as reflected in both the "no action" and "increased conservation" alternatives.

105.   FWS's approval of the HCP and issuance of an incidental take permit were therefore arbitrary and capricious, and contrary to the ESA.  See 16  U.S.C. § 1539(a)(2)(B); 5 U.S.C. § 706(2).

**FIFTH CAUSE OF ACTION**
[ESA – ISSUANCE OF BIOLOGICAL OPINION
THAT ARBITRARILY ASSESSES IMPACTS TO GRIZZLY BEARS]

106.    Plaintiffs hereby reallege and incorporate Paragraphs 1 through 105.

107.    FWS's Biological Opinion was arbitrary and capricious with respect to its evaluation of impacts to grizzly bears.  The ESA required FWS to rationally determine that the proposed HCP and incidental take permit were "not likely to jeopardize the continued existence" of the bull trout.  16 U.S.C. § 1536(a)(2). FWS failed to do so.

108.    First, as described above, FWS approved the HCP's grizzly bear management approach that utilizes a combination of seasonally secure areas and quiet areas that previous studies demonstrated to be inadequate to avoid jeopardizing grizzly bears.  Despite acknowledging that "core" grizzly habitat will decrease under the HCP and that this represents a possible increased risk of mortality to grizzly bears and increases the amount of otherwise-suitable habitat that grizzly bears might avoid, FWS approved a HCP that discards "core" habitat protections.  FWS failed to support this conclusion with scientific evidence or to consider relevant, readily available scientific information supporting a contrary conclusion.

109.    FWS's Biological Opinion thus arbitrarily dismissed the impacts of the HCP's seasonally secure areas and quiet areas, even though the best available

51

science indicates that such activities may appreciably reduce the likelihood of the survival and recovery of grizzly bears.

110.   FWS's Biological Opinion was therefore arbitrary and capricious, and contrary to the best available science.  See 16 U.S.C. § 1536(a)(2); 5 U.S.C. §706(2).

## SIXTH CAUSE OF ACTION
### [NEPA – ARBITRARY ASSESSMENT OF ENVIRONMENTAL IMPACTS]

111.   Plaintiffs hereby reallege and incorporate Paragraphs 1 through 110.

112.   NEPA requires federal agencies to prepare an EIS assessing and disclosing to the public the environmental effects of any proposed "major Federal action[] significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(c); see also 40 C.F.R. § 1502.16.

113.   FWS violated NEPA by failing to take a "hard look" at the effects of the Department's proposed forest-management activities and HCP, including: impacts to bull trout due to road building, delayed improvements to existing roads, and logging within the "no-harvest" riparian buffer; impacts to grizzly bears due to the Department's use of seasonally secure areas and quiet areas in place of "core area" grizzly bear management in the Stillwater Block; and cumulative impacts in light of foreseeable habitat degradation due to global warming.

114.   Further, FWS failed to "insure the … scientific integrity" of the Final EIS with respect to the discussion of impacts of the challenged action on bull trout in light of global warming.  40 C.F.R. § 1502.24.  As described above, FWS disregarded science indicating that the Department's forest management practices and habitat conservation plan will harm bull trout.  In addition, FWS failed to recognize scientific evidence that baseline habitat conditions for bull trout will be degraded by the impacts of global warming and that the effects of climate change on grizzly bear habitat will only increase the need for protected core areas.

115.   FWS's Final EIS is thus arbitrary, capricious, and not in accordance with NEPA and contrary to the APA, and must be set aside.  42 U.S.C. § 4332; 5 U.S.C. §706(2).

## SEVENTH CAUSE OF ACTION
### [NEPA – FAILURE TO EVALUATE REASONABLE RANGE OF ALTERNATIVES]

116.   Plaintiffs hereby reallege and incorporate Paragraphs 1 through 115.

117.   The Final EIS violated NEPA because it failed to analyze a reasonable range of alternatives and failed to analyze any alternative that would result in a conservation benefit to the HCP-covered species.  See 40 C.F.R. § 1502.14.

118.   FWS arbitrarily rejected feasible alternatives based on the Department's flawed assertion that alternatives that would limit its ability to generate revenue through logging activities were not feasible.

53

119.   The Final EIS therefore violated NEPA's requirement that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" to their proposed actions.  40 C.F.R. § 1502.14(a); <u>see also</u> 42 U.S.C. § 4332(2)(C)(iii).

120.   FWS's Final EIS is thus arbitrary, capricious, and not in accordance with the law, and must be set aside.  42 U.S.C. § 4332; 5 U.S.C. §706(2).

## PRAYER FOR RELIEF

THEREFORE, plaintiffs respectfully request that the Court:

1.      Declare that FWS acted arbitrarily and capriciously and violated the ESA and its implementing regulations in approving the HCP and issuing the incidental take permit;

2.      Declare that FWS acted arbitrarily and capriciously and violated the ESA and its implementing regulations in issuing a no-jeopardy Biological Opinion;

3.      Declare that the FWS acted arbitrarily and capriciously and violated NEPA in preparing a flawed EIS;

4.      Set aside and remand the HCP, incidental take permit, and no-jeopardy Biological Opinion to FWS for new analysis and agency actions consistent with the Court's decision;

5.      Award plaintiffs their reasonable fees, costs, and expenses, including

attorneys fees, associated with this litigation; and

6.      Grant plaintiffs such further and additional relief as the Court may

deem just and proper.

Respectfully submitted this 18th day of March, 2013.

          /s/Timothy J. Preso
Timothy J. Preso
Jenny K. Harbine
Earthjustice
313 East Main Street
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
jharbine@earthjustice.org

*Attorneys for Plaintiffs*
