IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN; MONTANA ENVIRONMENTAL INFORMATION CENTER; and NATURAL RESOURCE DEFENSE COUNCIL, | CV 13–61–M–DWM |
| Plaintiffs, | ORDER |
| vs. | |
| S.M.R. JEWELL, Secretary, U.S. Department of Interior, in her official capacity; and UNITED STATES FISH AND WILDLIFE SERVICE, | **FILED** |
| | AUG 2 1 2014 |
| Defendants, | Clerk, U.S. District Court District Of Montana Missoula |
| and | |
| MONTANA BOARD OF LAND COMMISSIONERS and MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION, | |
| Intervenor-Defendants. | |

Plaintiffs are various environmental organizations who challenge the

Secretary of the Interior's issuance of an incidental take permit under the

Endangered Species Act ("ESA") and the National Environmental Policy Act

1

("NEPA") for proposed logging and road building activities to be carried out by the Montana Department of Natural Resources and Conservation (the "Department") on state trust land in western Montana. The Secretary, through the Fish and Wildlife Service ("Service"), issued the permit based on the Department's habitat conservation plan ("the Plan"). Plaintiffs challenge the Plan and the permit principally on the grounds that (1) the required mitigation is not the maximum practicable for either bull trout or grizzly bears, (2) the no-jeopardy determination for bull trout is arbitrary and unlawful, (3) the Service failed to take a "hard look" at environmental impacts, (4) the Service did not consider a reasonable range of alternatives, and (5) the Service did not consider the cumulative impacts of climate change on bull trout. For the reasons discussed below, Plaintiffs' motion is granted as it relates to mitigation measures for grizzly bears and denied in all other respects.

## FACTUAL BACKGROUND

The Department manages trust land throughout the State of Montana. FWS 22850.[1] It is required to manage these lands so that they will generate revenues for Montana schools. HCP 1-4 to 1-6. In April 2003, the Service initiated

---

[1]     Citations to the Final EIS, HCP, and Biological Opinion are to the original pagination of those documents. All other citations to the record are to the Administrative Record and begin with FWS.

consideration of an application by the Department for an incidental take permit for proposed logging and related road building activities on approximately 548,500 acres of state trust land in western Montana. 68 Fed. Reg. 22,412 (April 28, 2003) (Notice of Intent to prepare EIS); FEIS ES-3 to ES-6; FWS 22850. This area includes two large blocks of land owned by the Department and scattered parcels across western and central Montana. FEIS ES-3. The blocks are the Stillwater Block, which includes the Stillwater and Coal Creek State Forests, and the Swan River State Forest. *Id.*

These lands provide habitat for a diverse array of aquatic life, with more than 86 fish species known or expected to occur in the project area, including the bull trout. *Id.* at 4-181. Following the listing of bull trout under the ESA in 1999, 64 Fed. Reg. 58910 (Nov. 1, 1999), critical habitat for the species was designated by the Service in 2005, 70 Fed. Reg. 56212 (Sept. 26, 2005). Under this designation, the Service uses a "core area," "management unit," and "interim recovery unit" hierarchy for purposes of consultation and recovery. BiOp IV-2. The core areas are the smallest units, comprising several local populations. *Id.* at 3. There are 21 bull trout core areas distributed across the Plan project area. *Id.* The entire Plan project area comprises 2.47 percent of the total habitat acres occupied by bull trout within the bull trout core areas in Montana. *Id.* at 287.

3

Collectively, the core areas in Montana form regional management units, of which two, the Clark Fork River and the Kootenai River Units, are contained within the Plan project area. *Id.* at 3. These management units are in turn contained within the Columbia River Interim Recovery Unit. *Id.* at 287.

The Plan project lands also provide a variety of wildlife habitat for approximately 407 species of wildlife, including grizzly bears. FEIS 4-301. In 1975, the Service determined that grizzly bears in the lower forty-eight states were in need of protection under the ESA as a threatened species. 40 Fed. Reg. 31,734 (July 28, 1975) (grizzly bear listing notice). Today, known grizzly bear populations persist in the United States in only four areas, including the Northern Continental Divide ecosystem in northwest Montana and the Cabinet-Yaak ecosystem in northwest Montana and northern Idaho. BiOp II-21. Both of these population areas encompass state lands that are subject to the Plan. *Id.* at 36.

The Service published a Final Environmental Impact Statement ("EIS") addressing the proposed incidental take permit on September 17, 2010, and completed its Biological Opinion addressing the proposed permit in December 2011; both determined that issuance of the permit would satisfy statutory requirements. 75 Fed. Reg. 57,059 (Sept. 17, 2010). In December 2011, the Service issued a Record of Decision approving issuance of an incidental take

4

permit to the Department. FWS 20982-1020.

In analyzing the proposed incidental take permit, the Service relied on the Plan prepared by the Department that covers a set of "forest management activities" including logging and road construction, maintenance, and use. HCP 1-15 to 1-16. To support increased logging activities, the Plan allows for a corresponding increase in road density by 30-40 percent in the Plan project area. *See* BiOp IV-213, 218, Table IV-13. In addition, the Plan substitutes "a combination of seasonally secure areas and quiet areas" for the former "core areas" set aside for grizzly bear preservation. *Id.* at II-87. Plaintiffs' primary concerns under the Plan include the effects on bull trout due to road building, the possibility of delayed improvements to existing roads, and logging within the riparian buffer and the effects on grizzly bears from the Department's abandonment of the "core area" management approach in the Stillwater Block.

## LEGAL STANDARDS

### A. Summary Judgment

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion.

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the non-moving party. *Id.* at 252. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment; factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## B. Administrative Procedure Act

Courts review claims regarding NEPA and the ESA under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et seq. Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, a "reviewing court shall hold unlawful and set aside agency action that is . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The court's scope of review is narrow, and the court should "not [] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

6

*Gardner v. U.S. Bureau of Land Mgt.*, 638 F.3d 1217, 1224 (9th Cir. 2011).

An agency's actions are valid if it "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation and internal quotation marks omitted). As long as the record supports the agency's decision, that decision should be upheld even if the record could support alternative findings. *Ark. v. Okla.*, 503 U.S. 91, 112-13 (1992). Review of the agency's action is "highly deferential, presuming the agency action to be valid." *Buckingham v. Secy. of U.S. Dept. of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010). However, this presumption does not require courts to "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A.*, 464 U.S. 89, 97 (1983) (internal quotations omitted).

ANALYSIS

## I.     The ESA

Bull trout and grizzly bears are protected under the ESA—"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). While listed under the ESA, wildlife species are shielded from a variety of harms, including

7

federal actions that would likely jeopardize the continued existence of the species and any "taking" of individual members of the species by any person. 16 U.S.C. § 1536(a)(1). This "take" prohibition extends to injuries arising from habitat degradation. *Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*, 515 U.S. 687, 699 (1995); 50 C.F.R. § 17.3.

Although taking of listed species is generally prohibited, § 10 of the ESA provides an exception where the "taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). In such circumstances, the Service may issue an incidental take permit to a third party who applies for a permit and satisfies specific statutory criteria. *Id.* at § 1539(a)(2); 50 C.F.R. § 17.32(b). The permitting process is "rigorous," *Ramsey v. Kantor*, 96 F.3d 434, 439 (9th Cir. 1996), requiring preparation of a habitat conservation plan, 16 U.S.C. § 1539(a)(2)(A). The habitat conservation plan must specify: (1) the impact that will result from the taking, (2) what steps the applicant will take to minimize and mitigate such impacts and the funding that will be available to implement these steps, (3) what alternative actions were considered and why they are not being utilized, and (4) such other measures that the Secretary may require as being necessary or appropriate for the plan. *Id.* Upon submission of the permit application and related conservation plan, the Secretary shall issue

8

the permit if she finds:

> after opportunity for public comment . . . that (I) the taking will be
> incidental; (ii) the application will, to the maximum extent practicable,
> minimize and mitigate the impacts of such taking; (iii) the applicant will
> ensure adequate funding for the plan will be provided; (iv) the taking
> will not appreciably reduce the likelihood of survival and the recovery
> of the species in the world; and (v) [other] measures, if any, required
> [by the Secretary] will be met.

*Id.* at § 1539(a)(2)(B).

### A. The Service did not act arbitrarily or capriciously when it determined the Plan mitigates take of bull trout to the maximum extent practicable, but did when it reached the same conclusion for grizzly bears.

To issue an incidental take permit, the Service must find that the habitat

conservation plan minimizes and mitigates the impacts of incidental take "to the

maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B)(ii). The term

"maximum extent practicable" is not defined in the statute, nor in any formal

agency regulations. The Service's Habitat Conservation Planning Handbook

provides that the maximum extent practicable finding "typically requires

consideration of two factors: adequacy of the minimization and mitigation

program, and whether it is the maximum that can be practically implemented by

the applicant." *See* Habitat Conservation Planning Handbook at 7-3,4; FWS

82983. The Handbook further asserts that, to the extent mitigation "can be

demonstrated to provide substantial benefits to the species, less emphasis can be placed" on whether mitigation is the maximum that can be practicably implemented. *Id.*

An agency rule is arbitrary and capricious if it entirely fails to consider an important aspect of the problem. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. It is plain on the face of the statute that the Service must make a finding that the Plan mitigates take to the maximum extent practicable. *Gerber v. Norton*, 294 F.3d 173, 184 (D.C. Cir. 2002). The statutory language of "maximum extent practicable" signifies "that the applicant may do something less than fully minimize and mitigate the impacts of the take where to do more would not be practicable." *Natl. Wildlife Fedn. v. Norton*, 306 F. Supp. 2d 920, 928 (E.D. Cal. 2004). "Moreover, the statutory language does not suggest that an applicant must ever do more than mitigate the effect of its take of species." *Id.* Therefore, if the Service rationally concludes based on the record before it that the level of mitigation provided for under the Plan clearly compensates for the take that will occur, the Service is under no obligation to inquire whether additional mitigation is financially possible. *Id.* at 928-29; *Natl. Wildlife Fedn. v. Norton*, 2005 WL 2175874, *13 (E.D. Cal. Sept. 7, 2005). That being said, if no such finding is made—and the record does not indicate that the proposed mitigation fully

10

compensates for the take under a plan or the adequacy of the proposed mitigation measures is a close call—the Service has an obligation to perform an independent inquiry into not just whether the proposed mitigation is practical, but whether greater mitigation would be impracticable. *Gerber*, 294 F.3d at 184-86; *Natl. Wildlife Fedn. v. Babbitt*, 128 F. Supp. 2d 1274, 1292-93 (E.D. Cal. 2000). An agency acts arbitrarily and capriciously when it fails to do so or relies solely on the licensee's financial representations and determinations as to practicability. *Gerber*, 294 F.3d at 185-86; *Babbitt*, 128 F. Supp. 2d at 1292.

Here, the Service found the measures under the Plan mitigate take of bull trout and grizzly bears to the maximum extent practicable. Therefore, the Service did not consider additional mitigation measures as they relate to either species. In the case of bull trout, the Service's determination is supported by record. In the case of grizzly bears, the Service failed to rationally justify its conclusion that the Plan fully offsets take in light of the record.

### 1. Bull Trout

The Plan at issue contains various measures to "minimize and mitigate" the impact of the project on bull trout. The Plan purports to minimize mileage and effects of new roads by incorporating an array of best practices and address sediment from existing roads through remedial work and road inventories. BiOp

11

IV-206-208. Within the first ten years, the inventories will survey roughly 1,100

miles of project-area roads laying within watersheds, HCP 2-97, classifying each

road as a low, medium or high risk for sediment delivery, BiOp IV-204. Remedial

roadwork must then be completed within the Plan's first 15 years, *id.* at 205, and is

predicted to reduce sediment in each bull trout core area by between 62-79

percent, *id.* at 215. The Plan also commits to reducing total sedimentation in the

project area by roughly 10 percent (compared to the pre-Plan baseline) for each of

the Plan's five decades. *Id.* at 216; HCP 7-4.

In addition to provisions to prevent further effects from road-building, the

Plan provides for mitigation measures related to increasing logging, including a

50-foot harvest buffer in riparian areas. Although the Plan includes allowances for

selective harvest within the buffer zone of individual trees in order to emulate

natural disturbance regimes and to address insect and disease infestation, FWS

20753, the use of these allowances is limited to less than 20 percent of the

Riparian Management Zone[2] area and must take into account the amount of the

Zone already affected by historic timber harvest or natural disturbances, BiOp IV-

179, 242. The Plan further provides for continued monitoring of stream

---

[2]    The Riparian Management Zone is distinct from the 50-foot buffer included under
the Plan. Although the two overlap and at times may be the same, the boundaries of the Riparian
Management Zone are determined based on the average tree height in a particular area.

12

temperatures and, if any deficiencies or inadequacies are discovered, requires the Department to collaborate with the Service to "devise and implement alternative conservation commitments[.]" FEIS 4-286-87. Moreover, in all cases, the harvest of trees located immediately adjacent to the stream is prohibited. Admin. R. Mont. 36.11.425(8); FWS 20816. Based on the above, the Service found the mitigation provided for under the Plan more than compensates for the expected take of bull trout. BiOp IV-189-90.

### a. Stream Temperature Model

Plaintiffs challenge the Service's reliance on a model it used to determine whether logging activities under the Plan would adversely affect in-stream temperatures. Even though the Plan may result in a limited increase in water temperatures, the Service determined that "for all model scenarios over the entire modeling period, the [Plan] provided equal or greater in-stream shade than existing conditions." BiOp IV-189-90. "In addition, all of the scenarios evaluated for the [Plan] indicate shade levels at least 10 percent greater than the established target levels." *Id.* at 190. "Based on the shade analysis, the stream temperatures are not expected to measurably increase from direct solar input, or indirectly from moderate changes in microclimate or soil temperature expected to occur from the

13

selective harvest regimes used by [the Department]."[3]  *Id.*

Plaintiffs contend the Service's reliance on this model is arbitrary and capricious because it does not account for any logging in the Plan's 50-foot buffer. *See Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (finding that the Forest Service violated NEPA by withholding information regarding the limitations of a in-stream sedimentation model).  However, the Service considered the potential impact of logging within the 50-foot buffer, likening its effects to those found under Alternative 1 (no action), and ultimately determined that modeling revealed that temperature changes under the no action alternative would be relatively small. HCP 4-281.  Comparing this result, the Service concluded a 50-foot buffer, even with the 20 percent allowance, would not measurably affect stream temperature. BiOp IV-195.  Although this modeling shows a marked decrease in the percentage of shading in the next ten years under the no action alternative and only a return to baseline shade levels in the long-term, it indicates that shade will generally remain above target levels.  FEIS 2-282-84.  The Service's choice to overestimate the impact of logging within the 50-foot buffer by analyzing a no-buffer situation was within its discretion and it did not act arbitrarily or capriciously in choosing an

---

[3]      The Service also determined "overstory removal adjacent to the stream channel" may result in a decrease in shade, but that it will not be significant due to the small area impacted.  BiOp IV-190.

14

analytical tool that resulted in greater protection. *See San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) (upholding "an agency's reliance on models that yield conservative data because the models incorporate the higher of known potential values in assessing the overall risk." (internal quotation marks, citation, and brackets omitted)).

### b. Short-Term Impacts of Road Construction

Plaintiffs raise the concern that the construction of new roads under the Plan could outpace the proposed remedial work. *See Natl. Wildlife Fedn. v. Norton*, 2005 WL 2175874, at *3 (noting that the plan "contains several provisions designed to ensure that its environmental objectives will be achieved and that development will not outpace the acquisition of mitigation lands."). When weighed against the proposed remediation goals and the monitoring regime put in place by the Plan, Plaintiffs' speculation on this point does not make the Service's decision arbitrary or capricious. As discussed above, the Plan establishes a strict timeline for compliance and goals for remediation. Moreover, the Plan includes specific reporting requirements to ensure the balance between new construction and remedial work is maintained, BiOp IV-211, and outlines several additional practices that will be undertaken by the Department in its construction of new roads, such as consultation with water resource specialists in certain circumstances

and site-specific mitigation measures, *id.* at 206-207, as well as the incorporation

of best management practices, *id.* at 228-29. The Service determined that "[t]he

combination of avoiding and minimizing impacts from new road design and

construction activities under the [Plan] and performing timely corrective actions

on existing chronic sediment sources would result in an ultimate net benefit for the

[Plan] fish species." ROD B-18. The Service also found "[B]ecause the [Plan]

maintains or directs the trend upward for all the important habitat parameters

(stream temperature, sediment . . . connectivity . . . ) in most core areas for the 50-

year Permit term, we expect a rate of recovery to be maintained or improve for bull

trout." BiOp IV-285. The Service considered the relevant factors and has

articulated a rational connection between those considerations and its

determination that the Plan fully mitigates the expected take of bull trout.

### 2. Grizzly Bears

Before the Plan, the Department maintained the 39,600-acre Stillwater Core

as secure habitat for grizzly bears.[4] FEIS 3-4. Within this area, administrative or

commercial activities are restricted to the winter denning period, and there is no

salvage allowances unless activities are conducted during that period or though

---

[4] "Secure habitat is defined . . . as areas that are a minimum distance of 0.31 miles from any open road or motorized trail and that receive no motorized use of roads or trails during the period they are considered secure habitat." FEIS 6-5 to 6-6.

helicopter harvest. *Id.* at 6-6. Under the Plan, the Department will no longer manage its lands as "secure core" habitat, but will implement a program of quiet areas and spring management restrictions, which will disallow motorized uses of these lands "during important seasonal times for grizzly bears." *Id.* The primary justification provided by the Service for the change in management is that the "core area" approach "effectively removed these lands from management" as they were closed to motorized use for a period of 10 years. BiOp II-87.

The Plan is expected to result in take of grizzly bears as some female bears are expected to be displaced from "key habitat." *Id.* at 83; ROD 21, B-5 to B-6. The Plan also opens up what was once secure habitat to human use, which will likely result in greater human-bear conflicts. ROD 21, B-5 to B-6. According to the Service, the take will be small, however, because the trust lands managed by the Department make up only a very small part of grizzly bear recovery zones (less than 2 percent), FEIS 4-304, adverse effects will only be temporary, ROD 20, and the Plan places strict limits on use, *id.* at A-17; FEIS G-74; BiOp II-137-38. The Service further insists the take of grizzly bears under the Plan will be fully mitigated, resulting in a net benefit for grizzly bears. ROD B-10. Plaintiffs challenge this determination, arguing that the shift from the "core area" approach to the "seasonally-secure" approach defies the best available scientific information

17

and the Service is required to investigate additional mitigation measures.

The Service concedes that the best way to protect grizzly bears is to restrict human use and access to their habitat. BiOp II-16-18. As mentioned above, the Service outlined the two primary approaches to achieving this goal: the "core area" approach (status quo) and variations of the "seasonally-secure" approach (proposed Plan). The Service considered the advantages and disadvantages of each approach, determining that the Plan's ultimate goal of increasing revenue for the Department was more compatible with the seasonally-secure option and that the seasonally-secure option would mitigate the expected take under the Plan. In reaching this decision, the Service relied on a peer reviewed study[5] and the use of a variation of the seasonally-secure approach in the Swan River State Forest.

The peer-reviewed study found the "core area" approach may not encompass the best habitat as "potentially the best bear habitat may be in heavily roaded areas while poor habitat is included in core areas. It is also possible that roads may be closed at great expense in areas of poor habitat that will only have marginal value to bears. By not incorporating habitat value, it is not possible to make optimal trade-offs between costs of road closures to people and value to

---

[5] McLellan, Bruce, M.A. Sanjayan, and Nova Silvy, *Peer Review of the Motorized Access Management Strategies for Grizzly Bear Habitat in the Northern Continental Divide Ecosystem* (Sept. 19, 2000). *See* FWS 39403-15.

18

bears." FWS 39409-10. However, the Service never found that the core areas in the Stillwater Core were comprised of inferior or poor habitat. Moreover, the study further states that "the assumptions made [under the seasonally-secure approach] were too bold at this time to fully justify the added risk and uncertainties created for grizzly bears under the proposed approach . . . . [W]e caution against any relaxation of establishing permanently secure areas unless the assumptions made meet a higher standard than demonstrate in this proposed approach." FWS 39414. Although the Service responded to some of the concerns raised in the study and adapted mitigation measures in response, FWS 82897-930, it acknowledged that the seasonally-secure approach still lacked scientific support for grizzly bear adaptation to closed roads, FWS 82915.

The Service also considered the use of a seasonally-secure model in the Swan River State Forest, finding it "is successfully supporting [bear] population connectivity from the Swan Range to the Mission Range across the Swan Valley." ROD A-17. Although the record describes the effectiveness of this approach in the Swan River context, it states that this success may have limited application in other circumstances, as the conclusions drawn from the study "are limited to the multi-ownership Swan Valley environment," involved a "limited female sample size" and "limited early spring data," and concludes that "[n]o cause/effect

19

relationships are understood." FWS 58530. Any attempt by the Service to use this case study to bolster the concerns raised in the peer review is thus limited.

Despite the limited scientific support for the proposed management approach, the Service found mitigation measures under the Plan were sufficient, merely asserting that the Plan expands the geographic scope of conservation measures and grizzly bears will adapt to changing habitat conditions. BiOp II-93. Although the Court will not wade into scientific debates or determine which management approach is best for grizzly bears, it must "ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 993, 1000 (9th Cir. 2008) (en banc) (quoting *Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 378 (1989)), *overruled on other grounds by Am. Trucking Assns., Inc. v. City of L.A.*, 599 F.3d 1046, 1052 (9th Cir. 2009). The Service's conclusory statements do not support its finding that the Plan compensates for the expected take of grizzly bears. If expanding the geographic area of the Plan as it relates to grizzly bears—which the Service argues is a mitigation measure—results in its own take, BiOp II-129-30, it is unclear how the Service determined it was adequate to mitigate take that would occur in the Stillwater Core. The Service has not rationally justified its finding that the approach under the Plan constitutes a

20

complete offset—much less a net benefit—such that additional mitigation

measures did not even need to be considered.[6] Therefore, its finding that the Plan

mitigates the take of grizzly bears to the maximum extent practicable is arbitrary

and capricious.

To the limited extent Federal-Defendants contend such analysis was

performed, such a position is belied by the record. Although the record contains a

chart of implementation cost by alternative, FWS 14697, it does not include any

analysis as to whether the magnitude of such costs would render a greater

mitigation alternative impracticable. *See Babbitt*, 128 F. Supp. 2d at 1292

(holding that conclusory economic analysis is not sufficient to meet the

requirements of "maximum extent practicable" under the ESA). Rather, the

---

[6]     At the very least, the Service's uncertainty regarding how bears will respond and adapt under the Plan makes the adequacy of the mitigation measures a close call. The Service's Handbook states,

> [P]articularly where adequacy of mitigation is a close call, the record must contain some basis to conclude that the proposed program is the maximum that can be reasonably required by the applicant. This may require weighing the benefits and costs of implementing additional mitigation, the amount of mitigation provided by other applicants in similar situations, and the abilities of that particular applicant.

*Babbitt*, 128 F. Supp. 2d at 1292 (quoting the Service Handbook). While this internal guidance is not binding on the Service, *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 902 (9th Cir. 1996), the interpretations and opinions of an agency "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Babbitt*, 128 F. Supp. 2d at 1292 (even if the Handbook language is not binding, it at least requires the Service to consider an alternative involving greater mitigation).

Service relied entirely on the Department's representations as to practicability. The Service states that the increased mitigation alternative "would decrease the opportunity for timber harvest and would result in revenue loss; therefore, implementing this alternative would not meet the economic feasibility screening criteria." FEIS 3-32. The Service does not explain what that "economic feasibility screening criteria" entails, stating only that the primary reason for the change from the "core area" approach to the "seasonally-secure" approach was that the implementation of the "core area" approach "impeded [the Department's] ability to meet its trust mandate to generate revenue for the trust beneficiaries from those lands." *Id.* at 6-6. This conclusion is undermined by the fact that the Montana Supreme Court has held that the trust mandate is not limited to financial return, but requires "maintenance efforts to ensure long-term sustainability" that goes beyond "immediate financial benefit . . . ." *Friends of the Wild Swan v. Dept. of Natural Resources & Conserv.*, 127 P.3d 394, 398-99 (Mont. 2005). This is a far cry from the strict revenue-generating view taken by both Federal-Defendants and Defendant-Intervenors. Federal-Defendants admonish the Court not to succumb to Plaintiffs' black and white view of take (either there is permanent core habitat or there is impermissible take) while at the same time asking this Court to accept their black and white view of revenue (either there is no core habitat or

there is no revenue). Both arguments are equally unpersuasive. Absent

independent investigation into the impracticability of greater mitigation measures,

the Service's finding that the Plan mitigates take of grizzly bears to the maximum

extent practicable is arbitrary and capricious.

### B.    The Service's jeopardy analysis for bull trout is sufficient.

In addition to the responsibility to review the permit application for

compliance with the requirements of § 10, the Secretary must ensure that the

issuance of the permit is consistent with ESA § 7(a)(2). *See* 16 U.S.C. §

1536(a)(2). When considering whether to issue an incidental take permit, the

Service may only do so upon a finding that it "is not likely to jeopardize the

continued existence of" a protected species, or result in the destruction or adverse

modification of critical habitat. *Id.*; 50 C.F.R. § 402.01(b). The Biological

Opinion must include "a summary of the information on which the [no jeopardy]

opinion is based, detailing how the agency action affects the species" based on

"the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2),

(b)(3). Plaintiffs contend that the Service failed to consider an important aspect of

the problem when it failed to analyze the near-term habitat loss to the bull trout

population in light of that population's short life-cycle. *See Pac. Coast Fedn. of*

*Fishermen's Assn. v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir.

2005) (finding an agency's no jeopardy determination arbitrary and capricious because it disregarded the short life-cycle of the coho salmon).

Here, the Service considered short-term impacts on bull trout in it no-jeopardy determination, specifically noting that increased short-term take will occur in situations where significant road construction is occurring near core area streams. BiOp IV-294-95. The Plan includes provisions that address short-term concerns, such as annual monitoring and compliance requirements, *id.* at 211-12, 228-29, in addition to the inventories and remedial work on existing roads set begin immediately and continue through the next 10-15 years, *id.* at 204-205. Having properly considered all aspects of the problem, the Service's determination is not arbitrary or capricious.

## II.    NEPA

NEPA is a purely procedural statute, intended to protect the environment by fostering informed agency decision-making. *See Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir.2009). NEPA "does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Assn. v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (citation and internal quotation marks omitted). Plaintiffs contend the Service violated NEPA by not (1)

24

taking a hard look at environmental impacts, (2) studying a reasonable range of alternatives, or (3) considering the cumulative effects of climate change on bull trout. The Service has complied with NEPA.

### A. The Service took the requisite "hard look."

In reviewing the adequacy of an EIS, courts "employ a rule of reason to determine whether the EIS contains a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002) (internal quotation marks and citation omitted). Review under this standard consists of determining whether an agency has taken a "hard look." *Id.* "The rule of reason analysis and the review for an abuse of discretion are essentially the same." *Id.* at 1072. The Court reviews the adequacy of an EIS using an objective good faith standard. *Id.*

Plaintiffs argue the Service failed to take a "hard look" at the environmental impacts of the Plan, particularly in those areas previously discussed. As discussed above, the only shortcoming of the Service's analysis is the adequacy of the mitigation measures provided for grizzly bears. However, even in that context the Service recognized the consequences to grizzly bears under the Plan, including increased interactions with humans and displacement. The Service has engaged in a reasonably thorough discussion of the significant environmental impacts of the

25

proposed action, meeting the "hard look" requirement.

## B.    The Service considered a reasonable range of alternatives.

The scope of an agency's alternative analysis under NEPA is defined by the stated purpose for the project. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Here, the purpose and need for the Plan is to "minimize take and conserve federally listed fish and wildlife species while providing long-term regulatory certainty and flexibility for [the Department]'s forest management practices on its [Plan] project area lands." FEIS 1-9. The four alternatives considered by the Forest Service included Alternative 1 (no action), Alternative 2 (the proposed Plan), Alternative 3 (increased conservation), and Alternative 4 (increased management flexibility). FEIS ES-6 to ES-9. Each alternative includes roughly 1,322-1,408 miles of road. *Id.* at 4-85. Plaintiffs contend the Service violated by NEPA by failing to consider a low-mileage option.

An agency "need only evaluate alternatives that are reasonably related to the purposes of the project." *League of Wilderness Defenders–Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (citation and internal quotations marks omitted); *Native Ecosystems Council*, 428 F.3d at 1247. "An agency need not [] discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with

26

the basic policy objectives for the management of the area." *Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Engrs.*, 524 F.3d 938, 955 (9th Cir. 2008) (internal quotation marks and citation omitted). The agency must "briefly discuss" the reasons why it eliminated any alternatives from detailed study. 40 C.F.R. § 1502.14(a); *see St. of Cal. v. Block*, 690 F.2d 753, 768 (9th Cir. 1982) (holding that the agency failed to consider a reasonable range of alternatives when all of the considered alternatives included to substantial development).

Here, at Plaintiffs' request, the Service considered a "less road building" alternative and ultimately rejected it as not economically feasible or operationally practicable, finding it "would likely result in increased costs and lost revenue to the trust beneficiaries, thereby not meeting [the Department]'s purpose and need." FEIS 3-33, G-139. Unlike the situation in *Block*, the Service has discussed the alternative proposed by Plaintiffs and determined it was not feasible and would not allow the Department to meet its trust mandate. *See Ariz. Past & Future Foundation, Inc. v. Lewis*, 722 F.2d 1423, 1428 (9th Cir. 1983) ("Alternatives that do not accomplish the purposes of the project may properly be rejected as imprudent."). Accordingly, the Service complied with NEPA.

## C. The Service considered cumulative impacts of climate change.

A "cumulative impact" is "the impact on the environment which results

27

from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7. An analysis of cumulative impacts requires the consideration of the combined effects of actions "in sufficient detail to be useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999) (internal quotation marks omitted). "The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Natl. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

In response to public comment, the Final EIS includes a chapter that addresses climate change. FWS 21690-705 . This section discusses the causes of climate change, its effects on forest management, projections for future temperatures, the environmental impacts of increased temperatures, current approaches to the issue, and a comparison of the effects of climate change across the alternatives. *Id.* The Service also addressed the effect of climate change on bull trout specifically, noting that "[f]uture loss of bull trout habitat due to climate change within the interior Columbia River basin was predicted to be 18 to 92 percent of the habitat areas that are currently thermally suitable and 27 to 99

28

percent of large . . . habitat patches." FEIS 4-231. The Service ultimately

concluded that "[g]lobal climate change may ultimately be a significant threat to

the persistence of native fishes because it will add to the current adverse effects of

invasive aquatic species and habitat degradation while increasing water

temperatures to potentially unsuitable thresholds." *Id.* at 4-247 (citation omitted).

Plaintiffs recognize that the Service included a fairly extensive discussion of the

effects of climate change in the Final EIS, (Pls.'s Br. in Support, Doc. 42 at 45),

but criticize the "disconnect" between this analysis and the Service's conclusions

regarding the environmental consequences of the Plan.

"[I]t is now well settled that NEPA itself does not mandate particular

results, but simply prescribes the necessary process." *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 350 (1989). "If the adverse environmental effects

of the proposed action are adequately identified and evaluated, the agency is not

constrained by NEPA from deciding that other values outweigh the environmental

costs." *Id.* Further, an EIS does not need to contain a "complete mitigation plan

that is actually formulated and adopted." *City of Carmel-By-The-Sea v. U.S. Dept.

of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (internal quotation marks

omitted); *see also Robertson*, 490 U.S. at 352 ("There is a fundamental distinction

. . . between a requirement that mitigation be discussed in sufficient detail to

ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other."). The Plan provides monitoring and adaptive management practices to address the predicted effects. FEIS 4-157-58, 4-389. Despite Plaintiffs' criticisms, this flexible approach meets NEPA requirements. *See City of Carmel-By-The-Sea*, 123 F.3d at 1154 ("The proposed mitigation plan is intended to be 'conceptual' only; the plan remains flexible to adapt for future problems . . . ."). The Final EIS also specifically addresses mitigating the impact of climate change on bull trout, stating "the additional protective measures included in the action alternatives, specifically the no-harvest buffers and certain limits on total riparian harvest, would likely reduce the risk of adverse aquatic habitat effects . . . anticipated from a changing climate." FEIS 4-298. Although Plaintiffs may be unhappy with the result, the Service's discussion of the effects of climate change and relevant mitigating measures is sufficient under NEPA.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the parties' motions for summary judgment (Docs. 41, 48, and 51) are GRANTED IN PART and DENIED IN PART. Plaintiffs' motion is granted to the extent that the Service's

30

determination that the Plan mitigates take of grizzly bears to the maximum extent practicable is arbitrary and capricious in violation of the ESA. Summary judgment is granted in favor of Federal-Defendants and Defendants-Intervenor on all of Plaintiffs' other claims.

IT IS FURTHER ORDERED that this matter is remanded for the purpose of conducting the analysis required by 16 U.S.C. § 1539(a)(2)(B)(ii) as it relates to grizzly bears.

IT IS FURTHER ORDERED that Plan will remain in effect while this matter is on remand with the exception of the portion of the Plan that abandons secure core grizzly bear habitat in the Stillwater Block. The agency is enjoined from implementing a new management approach regarding grizzly bear habitat in the Stillwater Block until the requirements of the ESA are met.

IT IS FURTHER ORDERED that the Clerk of Court is directed to close this case.

Dated this 21st day of August, 2014 at 2:14 p.m.

```
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT
```